THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

GEORGE CANNAROZZO,                          :
                                            :
              Plaintiff,                     :         CIVIL ACTION NO. 3:18-CV-267
                                            :
       v.                                   :         (JUDGE MARIANI)
                                            :
BOROUGH OF WEST HAZLETON and                :
DIANE PANZARELLA,                           :
                                            :
              Defendants.                   :
                                            :

## MEMORANDUM OPINION
### I. INTRODUCTION

Presently before the Court is the Motion for Summary Judgment of Defendants, Borough of West Hazleton and Diane Panzarella (Doc. 68). With this motion, Defendants seek summary judgment in their favor on Plaintiff's Fourth Amendment claims based upon individual and municipal liability. (*Id.*)

These claims arise from events which occurred on February 6, 2016, at a five-unit apartment building owned by Plaintiff in the Borough of West Hazleton ("Borough"). (Doc. 69 ¶¶ 26, 37.) On that date, the West Hazleton Fire Department responded to a report of a fire at the property. (*Id.* ¶ 37.) The Fire Department cleared the scene within ten minutes but received a second call to the property approximate twelve minutes later. (*Id.* ¶¶ 37, 41, 42.) Subsequently the Borough's code enforcement officer, Diane Panzarella, was called to the scene. (*Id.* ¶ 52.) Eventually, Fire Department crew members and Defendant

Panzarella accessed the basement of the apartment unit, and, thereafter, Defendant Panzarella called Carl Faust, an independent building inspector who does work for the Borough, to the scene.  (*Id.* ¶ 23, 55, 62.)  Plaintiff did not consent to a code inspection of the basement and no warrant was obtained.  (Doc. 1 ¶¶ 31, 34, 35, 48.)  The property was condemned by the Borough as a result of the search.  (*Id.* ¶ 37.)

For the reasons discussed below, the Court will grant Defendants' motion.

## II. STATEMENT OF UNDISPUTED FACTS[1]

During the relevant time period, Defendant Diane Panzarella was the Borough Code Enforcement Officer and Building Code Official, Shawn Evans was the Fire Chief at West Hazleton Fire Department, and Robert Segaria was the Deputy Chief.  (Doc. 69 ¶¶ 6, 20, 21; Doc. 73-1 ¶¶ 6, 20, 21.)  Carl Faust ("Mr. Faust") is a building inspector who did work for the Borough, including commercial building inspections. (Doc. 69 ¶¶ 23, 24; Doc. ¶¶ 23, 24.)

---

[1] In certain instances, Plaintiff denies a fact set out in the Statement of Undisputed Facts in Support of Defendant's Motion for Summary Judgment (Doc. 69) but does so on a qualified basis which renders all or part of the fact admitted.  The Court will specifically identify these instances and deem all or part of Defendant's averred fact admitted as appropriate. The Court will do so with reference to this footnote.

The Statement of Undisputed Facts in Support of Defendant's Motion for Summary Judgment (Doc. 69) and the Statement in Opposition to the Statement of Undisputed Material Facts in Support of Defendants' Motion for Summary Judgment (Doc. 73-1) contain citations to the record in support of or objection to averred facts.  The Court has verified the citations but, for the most part, does not reiterate them here.

Defendant Panzarella was hired by Defendant Borough as the Code Enforcement Officer and Building Code Official in September 2014.  (Doc. 69 ¶ 6; Doc. 73-1 ¶ 6.)  Before that Defendant Panzarella had several years' work experience in the City of Hazleton as a Building Code Official, Licensing, Permitting and Code Enforcement.[2]  (Doc. 69 ¶ 7; Doc. 69-1 Ex. 3, Panzarella Resume.)  Since 2013, Defendant Panzarella has been certified by the Commonwealth of Pennsylvania, Department of Labor and Industry, for Building Code Official and Uniform Construction Code.[3] (Doc. 69 ¶ 8.)  She also completed numerous training and certification programs from 2000 through 2016.[4]  (Doc. 69 ¶¶ 9-14.)

As of February 2016, Deputy Chief Segaria had 40 years of experience and training in the field of firefighting, including but not limited to cause and origin and electrical fires. (Doc. 69 ¶ 22; Doc. 73-1 ¶ 22.)

The International Fire Code ("IFC"), adopted and in use in the Commonwealth of Pennsylvania at the relevant time, provides in part at Section 104.11: "'Authority at fires and other emergencies. The fire chief or officer of the fire department in charge at the scene of a

---

[2]  *See supra* n.1.  The Court **strongly rejects** Plaintiff's denial of matters of record such as information in Defendant Panzarella's resume and professional certificates (*see, e.g.*, Doc. 69 ¶¶ 7-14 (citing Exs. 3-10 (Doc. 69-1 at 46-64); Doc. 73-1 ¶¶ 7-14) when Plaintiff had an opportunity to question Defendant Panzarella about these matters and presents absolutely no contradictory evidence. In these circumstances, denial based on Plaintiff being "without knowledge sufficient to form a belief of the truth or falsity" of the relevant averment (*see* Doc. 73-1 ¶¶ 7-14) is **totally inappropriate**.

[3]  *See supra* nn. 1, 2.

[4]  *See supra* nn. 1, 2.

fire or other emergency involving the protection of life or property or any thereof, shall have the authority to direct such operation as necessary to extinguish or control any fire, perform any rescue operation, investigate the existence of suspected or reported fires, gas leaks or other hazardous conditions or situations, or take any other action necessary in the reasonable performance of duty.'"[5] (Doc. 69 ¶ 19 (quoting IFC Section 104.11 (Defs.' Ex. 11 (Doc. 69-1 at 65-66)); Doc. 73-1 ¶ 19.)

During the relevant time, Plaintiff owned, maintained and operated property located at 10-12 East Oak Street in the Borough of West Hazleton ("the Property"), which is a five-unit apartment building. (Doc. 69 ¶ 26; Doc. 73-1 ¶ 26.)  The circuit breaker for the entire apartment building was located in the basement of the building. (Doc. 69 ¶ 35; Doc. 73-1 ¶ 35.)  The door to the basement was located outside at the back of the building.  (*Id.*)  The Plaintiff kept the basement door locked, and the tenants did not have access to the circuit breakers in the basement.  (Doc. 69 ¶ 36; Doc. 73-1 ¶ 36.)

Prior to the February 2016 incident at issue here, Defendant Panzarella had contact with the property and had found code violations in a second-floor apartment.  (Doc. 69 ¶¶ 27, 28; Doc. 73-1 ¶¶ 27, 28.)  The apartment was eventually condemned.  (Doc. 69 ¶ 29; Doc. 73-1 ¶ 9.)

---

[5] Though Plaintiff asserts that the writing speaks for itself and rejects any implication that the provision authorized Defendant Panzarella's search, Plaintiff does not otherwise deny the accuracy of the quoted provision.  (*See* Doc. 73-1 ¶ 19.)

On Saturday, February 6, 2016, at approximately 11:06 a.m., the West Hazleton Fire Department was dispatched to the Property in response to a reported commercial fire alarm.[6]  (Doc. 69 ¶ 37; Doc. 73-1 ¶ 37; Doc. 69-1 at 124 (Defs.' Ex. 18).)  Upon the fire officials' arrival, they noted a light smoke haze in all or portions of the first floor including the kitchen area of Apartment # 2.[7]  (Doc. 69 ¶ 38; Doc. 73-1 ¶ 38; Doc. 69-1 at 124 (Defs.' Ex. 18).)  They also observed a pan on the stove with grease in it, the stove was turned off, and there were no flames.[8]  (Doc. 69 ¶ 39; Doc. 73-1 ¶ 39; Doc. 69-1 at 124 (Defs.' Ex. 18).)

The West Hazleton Fire Department cleared the scene in response to the first fire alarm at approximately 11:12 am.  (Doc. 69 ¶ 41; Doc. 73-1 ¶ 41.)  The West Hazleton Fire Department was dispatched by Luzerne County 911 to a second fire alarm at the Property at 11:24 am, which was approximately 12 minutes after it left the scene in response to the first report.  (Doc. 69 ¶ 42; Doc. 73-1 ¶ 42.)  Deputy Chief Segaria and Chief Shawn Evans with the Fire Department crew responded to the second alarm at the Property.   (Doc. 69 ¶ 43; Doc. 73-1 ¶ 43.)  The West Hazleton Fire Department arrived on the scene at approximately 11:27 am.  (Doc. 69 ¶ 44; Doc. 73-1 ¶ 44.)  Upon arrival, the Fire Department

---

[6] Though Plaintiff denies Defendants' recitation of fact in ¶ 37, the recitation set out in the text is agreed upon.

[7] *See supra* n.1.

[8] *See id*.

crew found the first-floor apartment on the 12 East Oak Street side filled with heavy smoke.[9]

(Doc. 69 ¶ 45; Doc. 73-1 ¶ 45.)  Outside the back door of the building, the engine crew

discovered burnt papers with heavy black charring.  (Doc. 69 ¶ 46; Doc. 73-1 ¶ 46.)  Sparks

were noted coming from the stove in the first-floor apartment, and, at some point after the

fire crew's arrival, the stove was unplugged and removed to the outside.[10]  (Doc. 73-1 ¶ 48;

Doc. 69-1 at 128 (Defs.' Ex. 19).)

Defendant Panzarella was called to the scene after the crew's arrival at the Property

for the second time, and she arrived within fifteen minutes of being called.[11]  (Doc. 69 ¶¶ 51,

---

[9] *See id.*  By was of further explanation, the Court rejects Plaintiff's assertion that the report prepared by Fire Chief Evans "is hearsay and its existence and contents alone create a material issue of fact the existence of which must be determined at trial." (Doc. 73-1 ¶ 45.)  With this statement, Plaintiff apparently misapprehends the non-moving party's obligation on summary judgment to come forward with evidence which shows a genuine dispute.  As set out in the "Standard of Review" section of this Memorandum Opinion, the non-moving party must offer **specific facts contradicting those averred by the movant** to establish a genuine issue of material fact, *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888 (1990), and may not oppose summary judgment simply on the basis of the pleadings, or **on conclusory statements that a factual issue exists**.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

> A party asserting that a fact cannot be or is genuinely disputed **must support the assertion by citing to particular parts of materials in the record . . . or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact**.

Fed. R. Civ. P. 56(c)(1)(A)-(B) (emphasis added).  Here, Plaintiff has no grounds upon which to deny matters addressed by Chief Evans in his incident report based on hearsay in that Plaintiff has not shown that Defendants cannot produce admissible evidence to support the facts stated therein: although Plaintiff chose not to depose Evans, Defendants can produce him as a witness at trial and his recitation of statements made in his report would thereby be admissible.

[10] *See supra* nn. 1, 9.

[11] *See supra* n.1.

52; Doc. 73-1 ¶¶ 51, 52.)  The West Hazleton Fire Department was at the scene and in control of the Property when Defendant Panzarella arrived.  (Doc. 69 ¶ 53; Doc. 73-1 ¶ 53.)

The Fire Department accessed the basement, and Deputy Chief Segaria and the ladder crew entered the basement.  (Doc. 69 ¶ 55; Doc. 73-1 ¶ 55.)  Defendant Panzarella testified that when Deputy Chief Segaria came up from the basement "he basically said, you've got to get down there."[12]  (Doc. 69 ¶ 57; Doc. 73-1 ¶ 57; Panz. Dep. 54:20-25 (Doc. 69-1 at 27).)  The fire department was in control of the Property and was conducting an investigation in the basement when Defendant Panzarella was instructed to enter the basement.[13]  (Doc. 69 ¶ 58.)  Defendant Panzarella entered the basement at the instruction of Deputy Chief Segaria with the ladder crew, which was within 30-40 minutes of her arrival at the property, and at the same time the fire crew was in the basement.[14]  (Doc. 69 ¶¶ 59, 60.)  Multiple fire hazards were clearly evident in the basement upon visual inspection.[15] (Doc. 69 ¶ 61.)

---

[12]  *See id.* By way of further explanation, Plaintiff's denial of paragraph 58 is nonresponsive to Defendants' averred fact.  (*Compare* Doc. 69 ¶ 57 *with* Doc. 73-1 ¶ 57.)

[13]  *See supra* nn. 1, 12. (*Compare* Doc. 69 ¶ 58 *with* Doc. 73-1 ¶ 58.)

[14]  *See supra* nn. 1, 12. (*Compare* Doc. 69 ¶¶ 59-60 *with* Doc. 73-1 ¶¶ 59-60.)

[15]  *See supra* n.1.  By way of further explanation, the Court rejects Plaintiff's denial based on asserted "conflicting statements" by Segaria and unauthenticated documents.  (Doc. 73-1 ¶ 61.)  As discussed in Section IV(A) of this Memorandum Opinion, upon consideration of Segaria's explanation of his varying statements, no true conflict exists and the photographs of record were properly authenticated.

Subsequently, Mr. Faust was contacted by Defendant Panzarella, and he arrived at the Property within forty-five minutes.  (Doc. 69 ¶¶ 62, 64; Doc. 73-1 ¶¶ 62, 64.)  When she contacted Faust, Defendant Panzarella had determined that there was an imminent danger to life or property.[16]  (Doc. 69 ¶ 63.)  The fire department had control of the property when Mr. Faust arrived.[17]  (Doc. 69 ¶ 65; Doc. 73-1 ¶ 65.)

Deputy Chief Segaria, Defendant Panzarella, and Faust were in the basement together when Segaria pointed out immediate fire hazards to Panzarella and Faust.[18]  (Doc. 69 ¶ 67.)  Conditions in the basement included electrical wires "dangling" and "hanging" over water lines, splices in wires were coming out of electrical panels "like spaghetti," wires were exposed, there was no coating on wires, and wires were frayed and corroded.[19]  (Doc.

---

[16] *See supra* n.1.  Further, as set out in footnote 9, Plaintiff has not satisfied his obligation to come forward with contradictory facts in his answer to Defendants' statement.  (*Compare* Doc. 69 ¶ 63 *with* Doc. 73-1 ¶ 63.)

[17] *See supra* n.1.

[18] *See supra* nn.1, 15.  As set out in footnote 15, the Court rejects Plaintiff's denial based on asserted "conflicting statements" by Segaria.  (*See* Doc. 73-1 ¶¶ 61, 67.)  As discussed in Section IV(A) of this Memorandum Opinion, upon consideration of Segaria's explanation of his varying statements, no true conflict exists.

[19] *See supra* n.1.  Further, the specific conditions identified in the text were described in Defendant Panzarella's deposition testimony.  (Doc. 69 ¶¶ 69-73 (citing Panz. Dep. 57:24-25, 58:1-9, 114:1-14 (Doc. 69-1 at 30, 31, 39).)  Plaintiff's criticism of the use of this testimony is misplaced.  (*See* Doc. 73-1 ¶¶ 69-73.)  He states that Defendant Panzarella's observations are "conclusory and imprecise.  This is a material fact in existence of which needs to be determined at trial.  Ms. Panzarella is also relying on her own deposition testimony which creates a triable credibility issue which must be determined at trial." (*Id.*)  The bases identified for Plaintiff's denial are insufficient as Plaintiff has presented no evidence which contradicts Defendant Panzarella's testimony and has not otherwise pointed to evidence which generally undermines her credibility. *See supra* n.9 (setting out non-movant's burden).  Therefore, the Court has no basis to infer that Defendant Panzarella's credibility is an issue to be determined at trial and her statements are properly deemed admitted.

69 ¶¶ 69-73.)  Segaria, Panzarella, and Faust believed the conditions present in the basement presented a situation of imminent danger.[20]  (Doc. 69 ¶ 74.)

The Fire Department did not leave the Property until after 1:00 p.m.  (Doc. 69 ¶ 76; Doc. 73-1 ¶ 76.)  Plaintiff refused to go to the Property on February 6, 2016.  (Doc. 69 ¶ 77; Doc. 73-1 ¶ 77.)   The Property was condemned. (Doc. 69 ¶ 78; Doc. 73-1 ¶ 78.)

### III.  Standard of Review

Summary judgment "is appropriate only where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Gonzalez v. AMR*, 549 F.3d 219, 223 (3d Cir. 2008).  "An issue is genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party, and a factual dispute is material only if it might affect the outcome of the suit under governing law." *Kaucher v. County of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).  Thus, through summary adjudication, the court may dispose of

---

[20] *See supra* n.1.  By way of further explanation, Plaintiff's denial of this averment is rejected based on the Court's previous determination that Segaria did not present conflicting statements, *see supra* nn. 15, 18, and Panzarella's testimony has not been undermined, *see supra* n.19.  As for Faust, Plaintiff's statement that Faust noticed "no immediate fire hazards" in the basement (Doc. 73-1 ¶ 74 (citing Faust Dep. 40:16-41:15)) is a mischaracterization of his testimony in that, in the same line of questioning, Faust acknowledged that "a fire could have started immediately" based on certain conditions he observed and additional unknown factors such as loads put on receptacles at the time.  (Faust Dep. 4:24-41:23 (Doc. 73-2 at 25, 27)).  Further, Plaintiff does not acknowledge that Faust confirmed that he did not think there was an imminent danger *until* he saw the electrical problems in the basement.  (Faust Dep. 38:17-21 (Doc. 69-1 at 140).)  Thus, pursuant to the appropriate standard, *see supra* n.9, Defendants' statement 74 is deemed admitted.

those claims that do not present a "genuine dispute as to any material fact." Fed. R. Civ. P. 56(a).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Once such a showing has been made, the non-moving party must offer specific facts contradicting those averred by the movant to establish a genuine issue of material fact. *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888 , (1990). Therefore, the non-moving party may not oppose summary judgment simply on the basis of the pleadings, or on conclusory statements that a factual issue exists. *Anderson*, 477 U.S. at 248.

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record . . . or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1)(A)-(B). In evaluating whether summary judgment should be granted, "[t]he court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). "Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.,* 974 F.2d 1358, 1363 (3d Cir. 1992), *cert. denied* 507 U.S. 912, (1993).

However, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts."  *Scott v. Harris*, 550 U.S. 372, 380 (2007).  If a party has carried its burden under the summary judgment rule,

> its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.  The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact. When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

*Id.* (internal quotations, citations, and alterations omitted).

"In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of evidence."  *Anderson*, 477 U.S. at 255.  Therefore, when evidentiary facts are in dispute, when the credibility of witnesses may be in issue, or when conflicting evidence must be weighed, a full trial is usually necessary.

## IV. ANALYSIS

Plaintiff's claimed constitutional deprivations are brought under 42 U.S.C. § 1983 which states in pertinent part as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an

action at law, suit in equity, or other proper proceeding for redress[.]
42 U.S.C.A. § 1983.  To state a claim under 42 U.S.C. § 1983, a plaintiff must allege that
"(1) ... the conduct complained of was committed by a person acting under color of state law
and (2) ... [that] the conduct deprived the complainant of rights secured under the
Constitution or federal law." *Sameric Corp. v. City of Philadelphia,* 142 F.3d 582, 590 (3d
Cir.1988).

The constitutional right at issue here arises under the Fourth Amendment with
Plaintiff maintaining that the municipal and individual Defendants did not adhere to the
Fourth Amendment's general warrant requirement.  (*See*, *e.g.*, Doc. 1 ¶¶ 66-80.)
Specifically, Plaintiff claims that his "Fourth Amendment right to be free from unreasonable
search and seizure . . . was violated when a warrantless search of the Property occurred on
February 6, 2016, by code officials whose search was not supported by exigent
circumstances." (Doc. 73 at 5-6.)   Defendants first contend that no Fourth Amendment
violation occurred in this case because officials acted pursuant to the exigent circumstances
exception to the warrant requirement.  (Doc. 72 at 8-21.)  Defendants next aver that, if there
was a constitutional violation, Defendant Panzarella is entitled to qualified immunity
because the right at issue was not clearly established.  (*Id.* at 22-27.)  Finally, Defendants
maintain that Plaintiff cannot establish municipal liability against Defendant West Hazleton
under either a policy basis theory of liability or on a failure-to-train theory.  (*Id.* at 27-35.)

## A. Fourth Amendment

The Fourth Amendment states: "The right of the people to be secure in their persons,
houses, papers, and effects, against unreasonable searches and seizures, shall not be
violated." U.S. Const. amend. IV. "The Amendment guarantees the privacy, dignity, and
security of persons against certain arbitrary and invasive acts by officers of the
Government," without regard to whether the government actor is investigating crime or
performing another function. *City of Ontario, Cal. v. Quon*, 560 U.S. 746, 755–56 (2010)
(quoting *Skinner v. Railway Labor Executives' Assn.,* 489 U.S. 602, 613–614 (1989)).

In *Camara v. Municipal Court of the City and County of San Francisco*, 387 U.S. 523
(1967), the Court held that administrative searches conducted pursuant to administrative
code inspection programs "are significant intrusions upon the interests protected by the
Fourth Amendment, that such searches when authorized and conducted without a warrant
procedure lack the traditional safeguards which the Fourth Amendment guarantees to the
individual." *Id.* at 534. The Court qualified its holding as follows:

> [s]ince our holding emphasizes the controlling standard of reasonableness,
> nothing we say today is intended to foreclose prompt inspections, even without
> a warrant, that the law has traditionally upheld in emergency situations. *See
> North American Cold Storage Co. v. City of Chicago*, 211 U.S. 306, 29 S.Ct.
> 101, 53 L.Ed. 195 (seizure of unwholesome food); *Jacobson v. Commonwealth
> of Massachusetts*, 197 U.S. 11, 25 S.Ct. 358, 49 L.Ed. 643 (compulsory
> smallpox vaccination); *Compagnie Francaise de Navigation a Vapeur v.
> Louisiana State Board of Health*, 186 U.S. 380, 22 S.Ct. 811, 46 L.Ed. 1209
> (health quarantine); *Kroplin v. Truax*, 119 Ohio St. 610, 165 N.E. 498 (summary
> destruction of tubercular cattle). On the other hand, in the case of most routine
> area inspections, there is no compelling urgency to inspect at a particular time
> or on a particular day. Moreover, most citizens allow inspections of their

property without a warrant. Thus, as a practical matter and in light of the Fourth
Amendment's requirement that a warrant specify the property to be searched,
it seems likely that warrants should normally be sought only after entry is
refused unless there has been a citizen complaint or there is other satisfactory
reason for securing immediate entry.

387 U.S. at 539-40.

In *Michigan v. Tyler*, 436 U.S. 499 (1978), the Court considered the Fourth

Amendment warrant requirement in the context of various officials' responses to a fire and

entry onto the fire-damaged property in its aftermath and concluded that "[a]s a general

matter, . . . entries to investigate the cause of a fire must adhere to the warrant procedures

of the Fourth Amendment." *Id.* at 508. The Court then considered recognized situations

where warrantless entry may be legal including where there is a compelling need for action

by criminal law enforcement and no time to secure a warrant, 436 U.S. at 509 (citing

*Warden v. Hayden*, 387 U.S. 294 (1967)), and, in the regulatory field, where prompt

inspection is needed in an emergency situation, *id.* (citing *Camara*, 387 U.S. at 539).

After concluding that a "burning building clearly presents an exigency of sufficient

proportions to render a warrantless entry reasonable," *id.*, the Court disagreed with the

proposition that "the exigency justifying a warrantless entry to fight a fire ends, and the need

to get a warrant begins, with the dousing of the last flame," *id.* at 510 (citation omitted). The

Court found this view of the firefighting function to be "unrealistically narrow" in that

> [f]ire officials are charged not only with extinguishing fires, but with finding their
> causes. Prompt determination of the fire's origin may be necessary to prevent
> its recurrence, as through the detection of continuing dangers such as faulty
> wiring or a defective furnace. Immediate investigation may also be necessary

to preserve evidence from intentional or accidental destruction. And, of course, the sooner the officials complete their duties, the less will be their subsequent interference with the privacy and the recovery efforts of the victims. For these reasons, officials need no warrant to remain in a building for a reasonable time to investigate the cause of a blaze after it has been extinguished.

*Id.*

An action is "reasonable" under the Fourth Amendment, regardless of the individual officer's state of mind, "as long as the circumstances, viewed *objectively,* justify [the] action." *Brigham City, Utah v. Stuart*, 547 U.S. 398, 404 (2006) (quoting *Scott v. United States,* 436 U.S. 128, 138 (1978) (emphasis added). An official's belief that imminent danger exists such that action without a warrant is allowed under the exigent circumstances objection to the warrant requirement must be an objectively reasonable belief. *See Parkhurst v. Trapp,* 77 F.3d 797, 711 (3d Cir. 1996).

It is typically the defendant's burden to show that the consent or exigency exception to the warrant requirement applies. *Chinneah v. East Pennsboro Township*, 761 F. App'x 112, 117 (3d Cir. 2019) (not precedential) (citing *United States v. Price*, 558 F.3d 270, 177 (3d Cir. 2009); *Parkhurst*, 77 F.3d at 711). Here, only the exigency exception is at issue. (*See* Doc. 13 at 21.)

Record evidence shows that Deputy Chief Segaria accessed the basement with a fire crew and Defendant Panzarella did not initially accompany them. Though the reason for the fire crew's entry is not directly before the Court because it is Defendant Panzarella's

15

entry which is at issue in Defendant's Fourth Amendment claim, the Court will nonetheless review evidence related to the initial entry.

Segaria testified that Chief Evans made the determination to enter the basement and the question of why he did so was for Evans to answer.  (Segaria Dep. 24:3-5, 36:12-15 (Doc. 73-2 at 17, 36).)  When asked whether he thought it was necessary to investigate other portions of the house for fire, Segaria responded that he did not because he thought the incident was related to the stovetop itself and the stove had been removed.  (Segaria Dep. 36:16-23 (Doc. 73-2 at 18).)  However, he added that the issue remained that the Fire Department did not "have access to the circuit breaker to shut the circuit off, to secure the electrical oven."  (Segaria Dep. 36:24-37:1 (Doc. 73-2 at 18).)  Segaria agreed that the cause of the fire could have been related to electrical problems with the stove itself and the cause of the fire had not been fully determined before entry into the basement.  (Segaria Dep. 43:17-45:23 (Doc .73-2 at 19).)

Segaria testified that he was present in the basement when it was determined that there were multiple code violations but he himself did not make that assessment.  (Segaria Dep. 22:10-20 (Doc. 73-2 at 17).)  He confirmed that he did not "make a personal opinion based on the situation, any hazardous conditions that [he] would have seen."  (Segaria Dep. 22:22-24 (Doc. 73-2 at 17).)  Segaria was later asked to clarify what he meant when he said he had not assessed the basement and he responded that he "did not go bit by bit.  These were obvious, blatant, that I could see."  (Segaria Dep. 42:8-11 (Doc. 73-2 at 19).)  "These"

related to photographs which Segaria was shown and he identified as "pictures . . . of hazardous electrical conditions that existed in the basement" which he confirmed could potentially pose "an immediate fire hazard."  (Segaria Dep. 24:9-25:17 (Doc. 73-2 at 17).)

As noted in the Statement of Undisputed Facts section of this Memorandum Opinion, the Court rejects Plaintiff's assertion that Segaria made contradictory statement on this issue (Doc. 73 at 8-9).  *See supra* nn. 15, 18.  Rather, the Court finds Segaria's explanation of his varying statements adequate and concludes he did not, as Plaintiff asserts, present contradictory testimony which "raise issues of material fact which need to be assessed at trial" (Doc. 73-1 ¶ 74).

Segaria also testified that, before anyone had accessed the basement, he told Defendant Panzarella that the cooktop in the apartment had been "described as sparking and [there was] a capped gas line in the kitchen itself."  (Segaria Dep. 22:25-23:19 (Doc. 73-2 at 17).)

This evidence shows that the fire crew's entry into the basement was related to the second incident in which the stove was removed from the apartment unit, whether it was to check for extension of the fire or to turn off the circuit breaker "to secure the electrical oven" as Segaria said would be a concern (Segaria Dep. 36:24-37:1 (Doc. 73-2 at 18)).  As such, the fire crew's entry into the basement can be considered an extension of their firefighting duties, i.e., remediation of a potential hazard related to the incident or checking for an extension of the fire into the basement.  Activities to prevent a fire's recurrence are properly

characterized as reasons for firefighters to remain in a building with no warrant and present no Fourth Amendment violation. *See Tyler*, 436 U.S. at 510.

Unrefuted evidence also shows that, upon entry into the basement, conditions considered potentially immediately hazardous were obvious. (Segaria Dep. 24:9-25:17, 42:8-11 (Doc. 73-2 at 17, 19).)  Though Plaintiff contends that the photographs Segaria was shown at his deposition and identified as "pictures . . . of hazardous electrical conditions that existed in the basement" (Segaria Dep. 24:9-20 (Doc. 73-2 at 17)) are unauthenticated (Doc. 73 at 9), Segaria's deposition testimony is "testimony of a witness with knowledge" pursuant to Rule 902 of the Federal Rules of Evidence as it is "[t]estimony that an item is what it is claimed to be," Fed. R. Evid. 902(b)(1).

The evidence also shows that, before Defendant Panzarella entered the basement, Segaria had told her that the cooktop in the apartment had been "described as sparking and [there was] a capped gas line in the kitchen itself." (Segaria Dep. 22:25-23:19 (Doc. 73-2 at 17).)  Based on personal involvement, Defendant Panzarella also had knowledge of a previously condemned apartment at the Property. (Doc. 69 ¶ 29; Doc. 74-1 ¶ 29.)  In the circumstances presented, a reasonable factfinder could not dispute that the directive recounted as "you've got to get down there" given by Deputy Chief Segaria to Defendant Panzarella conveyed a sense of urgency regarding the situation in the basement, particularly since Segaria had just come from the basement and was one of those in charge at the scene. (Doc. 69 ¶ 57; Doc. 73-1 ¶ 57; Panz. Dep. 54:20-25 (Doc. 69-1 at 27).)

18

Viewed in this context, no reasonable factfinder could conclude that it was objectively unreasonable for Defendant Panzarella to respond to Deputy Chief Segaria's request without securing a warrant.  Seen from a different perspective, reasonable factfinders would agree that Defendant Panzarella had an objectively reasonable basis to conclude that this was an emergency situation where prompt inspection was needed.  *See Tyler*, 436 U.S. at 509 (citing *Camara*, 387 U.S. at 539).  Thus, no Fourth Amendment violation can be grounded in Defendant Panzarella's entry into the basement.

As previously noted in the margin, Plaintiff's criticism of Defendant Panzarella's testimony is without merit.  *See supra* n.19.  Although Plaintiff avers that Defendant Panzarella's "character for truthfulness or propensity to tell the truth is a material fact which needs to be determined at trial" (Doc. 73-1 ¶ 54), Plaintiff has presented no evidence which contradicts Defendant Panzarella's testimony relied upon in support of summary judgment and Plaintiff has not otherwise pointed to evidence which generally undermines her credibility.  Therefore, the Court has no basis to conclude that Defendant Panzarella's credibility is an issue to be determined at trial.

Although Plaintiff identifies the "true question" to be whether there was a sufficient emergent situation to gain access to the basement, Plaintiff also contends that Defendant Panzarella was not authorized to conduct a warrantless code search.   (Doc. 73 at 13-14.)

Based on the current record, the Court concludes that a reasonable factfinder could not find that Defendant Panzarella did not have authority to conduct a warrantless search

after entering the basement.  She testified "[w]hat I saw in the basement was an

emergency" based on "the condition of the wiring."  (Panzarella Dep. 118:12-119:6 (Doc.

73-2 at 7-8).)  The following dialog from Defendant Panzarella's deposition illustrates this

point.

> Q. . . . [W]hen you called Mr. Faust on February 6, 2016, was there, at that
> moment in time, was there an imminent danger to life or property"
>
> A. In my eyes, yes.
>
> Q. And how was that?
>
> A. Because of the nature of those wires in the basement and the splicing going
> on.  If you have a stove that's sparking, how could you tell that sparking is not
> being caused by those wires being spliced.
>
> Q. So you felt that there was an emergency circumstance as of February 6
> when you called Mr. Faust?
>
> A. Yes.
>
> Q. And what was the emergency?
>
> A. The nature of the basement, the condition of that basement.
>
> Q. So even though the fire department had secured the premises, you felt that
> there was an emergency because of the nature of the basement?
>
> A. Yes.
>
> Q. And you didn't know what was in the basement before you went in, correct?
>
> A. No.
>
> Q. What was it about the basement that you thought was causing an
> emergency?

A. Just the nature of the wires in there and the cuts and exposed wires. I know you saw pictures. You cannot imagine what it was like. I mean, when I tell you, you have a wire with missing coating on it, and just wiring opened up, the wires going into electrical panels were so corroded they frayed. There was electrical tape with other pieces of wire dangling from them. It's horrible. It was horrible. If in fact I did not do that, there would have been four other families suing me for not protecting their life."

(Panz. Dep. 113:2-114:13 (Doc. 69-1 at 38-39).)

Defendant Panzarella's initial assessment is supported by Segaria's finding of obvious hazardous conditions upon entry into the basement. (Segaria Dep. 42:10-11 (Doc. 73-2 at 19).) Panzarella's and Segaria's characterizations of the basement situation are further confirmed with Faust's acknowledgement that he did not think there was an imminent danger *until* he saw the electrical problems in the basement. (Faust Dep. 38:17-21 (Doc. 69-1 at 101).) In sum, three professionals considered the basement wiring situation to be an imminent danger which required prompt attention.

Given the foregoing, no reasonable factfinder could conclude that the situation did not present exigent circumstances to proceed with a warrantless inspection--professionals similarly assessed the basement wiring situation and Defendant Panzarella saw a possible connection between the wiring situation and the stove on which the fire reportedly occurred. Plaintiff's assertion that summary judgment is not warranted because the "[t]he nature of the emergency is far from clear" (Doc. 73 at 15) is based on a misapprehension of the relevant inquiry. Plaintiff frames "the fundamental question in this case" to be "whether there was an exigency *created by a fire* such that the access to the basement by first the Department and

then subsequently Ms. Panzarella was justified to conduct a codes inspection without a

warrant considering that Ms. Panzarella was not on scene to determine cause and origin of

fire and that she knew of no emergency before entering the basement." (Doc. 73 at 15

(emphasis added).)  However, this statement of the issue misses a key component of the

appropriate inquiry, i.e., the exigent circumstances supporting Defendant Panzarella's initial

entry into the basement and subsequent inspection need not, as Plaintiff's states, have

been *created* by the fire.  Rather, the presence of an emergency situation which was

detected in the process of handling the fire call to the property but not created by the fire

provides a sufficient basis to apply the exigent circumstances exception to the Fourth

Amendment's warrant requirement.  Because the evidence of record supports the

conclusion that reasonable factfinders could not disagree that the discovery of the

basement wiring situation here gave rise to exigent circumstances which supported prompt

inspection undertaken by Defendant Panzarella and Mr. Faust, summary judgment in

Defendants' favor on Plaintiff's Fourth Amendment claim is warranted.

   In support of his claim that summary judgment is not appropriate because

Defendants have failed to show that an emergency existed or was reasonably perceived

when Defendant Panzarella began her inspection of the basement, Plaintiff encourages the

Court to adopt the analysis which was set out in the Court's Memorandum Opinion denying

Defendant's motion to dismiss.  (*See* Doc. 73 at 10-11 (quoting Doc. 28 at 18-19).)  In that

Memorandum Opinion, the Court stated that

> [n]othing in the Court's conclusions should be construed to assess the merits
> of Plaintiff's Fourth Amendment claim or Defendant Panzarella's ultimate
> entitlement to qualified immunity.  Rather, the Court's determinations are based
> on the facts properly considered on a motion to dismiss, the necessity of
> drawing inferences in favor of Plaintiff, *see, e.g., McTernan v. City of York*, 577
> F.3d 521, 526 (3d Cir. 2009), and the finding that significant questions essential
> to the matters at issue remain unanswered.

(Doc. 28 at 23-24.)  Thus, at the summary judgment stage of the proceedings, the Court

reviews the issues presented de novo and, for the reasons set out above, rejects Plaintiff's

argument that "the factual record pertaining to exigency here is no clearer" (Doc. 73 at 10).

Although the Court concludes that summary judgment is warranted on Plaintiff's

Fourth Amendment claim because no reasonable factfinder could conclude that exigent

circumstances did not exist, the Court will proceed to address the issues of qualified

immunity and *Monell* liability, assuming *arguendo* that a Fourth Amendment violation

occurred.

**B.  Qualified Immunity**

Assuming a Fourth Amendment violation *arguendo*, the Court must determine

whether Defendant Panzarella would be entitled to qualified immunity based on her failure

to obtain a warrant for her activities at the Property on February 6, 2016.  For the reasons

discussed below, the Court concludes that she would be entitled to qualified immunity.

As the United States Supreme Court recently stated,

> "[q]ualified immunity attaches when an official's conduct does not violate clearly
> established statutory or constitutional rights of which a reasonable person
> would have known." *White* v. *Pauly*, 580 U. S. ——, ——, 137 S.Ct. 548, 551,
> 196 L.Ed.2d 463 (2017) (*per curiam*) (internal quotation marks omitted). A right

is clearly established when it is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11, 136 S.Ct. 305, 193 L.Ed.2d 255 (2015) (*per curiam*) (internal quotation marks omitted). Although "this Court's case law does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *White*, 580 U. S., at ——, 137 S.Ct., at 551 (alterations and internal quotation marks omitted). This inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Brosseau v. Haugen*, 543 U.S. 194, 198, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004) (*per curiam*) (internal quotation marks omitted).

*Rivas-Villegas v. Cortesluna*, No. 20-1539, 2021 WL 4822662, at *2 (U.S. Oct. 18, 2021).

This Court has summarized the doctrine of qualified immunity as follows:

Government officials performing "discretionary functions," are insulated from suit if their conduct did not violate a "clearly established statutory or constitutional right[ ] of which a reasonable person would have known." *Wilson v. Layne*, 526 U.S. 603, 609 (1999); *see also Pearson v. Callahan*, 555 U.S. 223, 231 (2009). This doctrine, known as qualified immunity, provides officials performing discretionary functions not only defense to liability, but also "immunity from suit." *Crouse v. S. Lebanon Twp.*, 668 F. Supp. 2d 664, 671 (M.D. Pa. 2009) (Conner, J.) (citations omitted). Qualified immunity balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably. The protection of qualified immunity applies regardless of whether the government official's error is "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Pearson*, 555 U.S. at 231.

Determinations regarding qualified immunity, and its application in a given case, require a court to undertake two distinct inquiries. First, the court must evaluate whether the defendant violated a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201-02 (2001), *abrogated in part by Pearson*, 555 U.S. 223. If the defendant did not actually commit a constitutional violation, then the court must find in the defendant's favor. *Saucier*, 533 U.S. at 201. If the defendant is found to have committed a constitutional violation, the court must undertake a second, related inquiry to assess whether the constitutional right in question was "clearly established" at the time the defendant acted. *Pearson*,

555 U.S. at 816; *Saucier*, 533 U.S. at 201-02. The Supreme Court of the United States has instructed that a right is clearly established for purposes of qualified immunity if a reasonable state actor under the circumstances would understand that his or her conduct violates that constitutional right. *Williams v. Bitner*, 455 F.3d 186, 191 (3d Cir. 2006) (citing *Saucier,* 533 U.S. at 202).

*Bomba v. Dep't of Corr.*, No. 3:16-CV-1450, 2018 WL 7019254, at *7–8 (M.D. Pa. Sept. 4, 2018), *report and recommendation adopted in part, rejected in part sub nom. Bomba v. Commonwealth of Pennsylvania Dep't of Corr.*, No. 3:16-CV-01450, 2019 WL 177471 (M.D. Pa. Jan. 11, 2019).

In this legal construct, the objective reasonableness of the defendant's conduct rather than the defendant's subjective intent is relevant to the determination of whether the doctrine applies. *Harlowe v. Fitzgerald*, 457 U.S. 800, 818 (1982). In *Pearson v. Callahan*, 555 U.S. 223 (2009), the Supreme Court clarified that the procedure set out in *Saucier* is often appropriate, but was no longer mandatory: "The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 236.

In *Kane v. Barger*, 902 F.3d 185 (3d Cir. 2018), the Circuit Court distilled from Supreme Court precedent the following principles for determining when a constitutional right may be deemed clearly established:

> A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right. We do not require a case directly on point to find that a right was clearly established. Rather, to be clearly established, a right need only have a sufficiently clear

25

foundation in then-existing precedent. In this inquiry, we look first to applicable Supreme Court precedent.  However, even if none exists, it may be possible that a robust consensus of cases of persuasive authority in the Courts of Appeals could clearly establish a right for purposes of qualified immunity.

Defining the right at issue is critical to this inquiry, and we must frame the right in light of the specific context of the case, not as a broad general proposition.  This does not mean that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful.  Accordingly, it need not be the case that the exact conduct has previously been held unlawful so long as the contours of the right are sufficiently clear.  Said another way, we do not require a case directly mirroring the facts at hand, so long as there are sufficiently analogous cases that should have placed a reasonable official on notice that his actions were unlawful.  As such, officials can still be on notice that their conduct violates established law even in novel factual circumstances.

902 F.3d at 194-195 (internal quotations and citations omitted).

*White* expanded on the concept of framing the issue in the specific context of the case and consideration of relevant precedent, reiterating "the longstanding principle that 'clearly established law' should not be defined 'at a high level of generality.'" 137 S. Ct. at 552 (quoting *Ashcroft v. al–Kidd,* 563 U.S. 731, 742 (2011)).  Rather, "the clearly established law must be "particularized" to the facts of the case. *Id.* (quoting *Anderson v. Creighton,* 483 U.S. 635, 640 (1987)).  The Court looked to whether the reviewing court had identified a case where an officer acting under similar circumstances to the § 1983 defendant officer in *White* had been charged with violating the Fourth Amendment.  *Id.* "'[G]eneral statements of the law are not inherently incapable of giving fair and clear warning' to officers, *United States v. Lanier,* 520 U.S. 259, 271, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997), but 'in the light of pre-existing law the unlawfulness must be

apparent,' *Anderson v. Creighton, supra,* at 640, 107 S. Ct. 3034." *White*, 137 S. Ct. at 552.

The Court further noted that the appellate court had recognized that it was a case which

presented a unique set of facts and circumstances and [t]his alone should have been an

important indication that White's conduct did not violate a 'clearly established' right." *Id.*

Assuming *arguendo* that a Fourth Amendment violation occurred in this case, the

Court cannot conclude that Defendant Panzarella violated a clearly established right.

Administrative searches without a warrant are allowed where prompt inspections are

needed in emergency situations. *Camara*, 387 U.S. at 539.  In the aftermath of a fire,

prompt detection of continuing dangers such as faulty wiring are recognized in the

firefighting context as a reason to investigate without a warrant. *Tyler*, 436 U.S. at 510.

Given this precedent, there is no reason for a code official to think that her participation in

prompt detection of continuing dangers in the aftermath of a fire would not be exempted

from the Fourth Amendment's warrant requirement.   Given the unique facts and

circumstances presented in this case, the general requirement that a warrant be obtained

for an administrative search is too broad to put a code enforcement officer on notice that her

conduct violated the Fourth Amendment. *White,* 137 S. Ct. at 552; *Lanier,* 520 U.S. at 271.

In the light of pre-existing law regarding administrative warrants and post-fire activity,

unlawfulness associated with a code inspector's participation in post-fire on-scene activity at

the request of a fire official in control of the scene would not be apparent. *White*, 137 S. Ct.

at 552; *Anderson,* 483 U.S. at 640.  Therefore, Defendant Panzarella would be entitled to qualified immunity if a Fourth Amendment violation occurred.

Plaintiff again encourages the Court to adopt the previous reasoning in connection with the denial of Defendants' motion to dismiss which led to a finding that Defendant Panzarella had not shown entitlement to qualified immunity at the motion to dismiss stage. (Doc. 73 at 14-15.)  The Court declines to do so based on the de novo review of the issue conducted at this stage of the proceedings and the impact of facts of record relevant to Defendant's Panzarella's entitlement to qualified immunity.

## C. Municipal Liability

Proceeding with the analysis under the *arguendo* assumption that a Fourth Amendment violation occurred, the remaining issue is whether Defendant Borough can be liable for the alleged Fourth Amendment violation.  The Court concludes that no reasonable factfinder could conclude that the Borough would be responsible for Defendant Panzarella's Fourth Amendment violation.

A municipality or other local government entity is a "person" for purposes of § 1983. *Bd. Of the County Comm'rs of Bryan County, Oklahoma v. Brown*, 520 U.S. 397, 403 (1997) (citing *Monell*, 436 U.S. at 689).  However, when a plaintiff alleges that a local government is responsible for the deprivation of a constitutional right by its employee, he must satisfy the requirements identified in *Monell v. Dep't of Social Services*, 436 U.S. 658 (1978).

In *Monell*, the Supreme Court recognized that while local government units can be made liable under § 1983, "a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell*, 436 U.S. at 691. Thus, a local government cannot be held liable for "an injury inflicted solely by its employees or agents." *Id*. at 694. Liability exists only where the "execution of a government's policy or custom . . . inflicts the injury." *Id*.

The Third Circuit has clarified that a municipality can be held liable for the acts of its employees in one of three ways:

> (1) the individual acted pursuant to a formal government policy or a standard operating procedure long accepted within the government entity, (2) the individual himself has final policy-making authority such that his conduct represents official policy, or (3) a final policy-maker renders the individual's conduct official for liability purposes by having delegated to him authority to act or speak for the government, or by ratifying the conduct or speech after it has occurred.

*Hill v. Borough of Kutztown*, 455 F.3d 225, 245 (3d Cir. 2006).

In his Complaint, Plaintiff identifies two bases for *Monell* liability: the policy of the Borough of West Hazleton that code officials may conduct a search of property at any time if requested by police or fire officials if the police or fire officials deem that a hazard exists (Doc. 1 ¶ 69); and a failure to train based on the beliefs of Defendant Panzarella and Mr. Faust regarding their authority to conduct warrantless searches (*id.* ¶ 74). In his opposition brief, Plaintiff primarily identifies *Monell* liabililty based on the "custom of the officials of the Borough of West Hazleton to allow code inspections without any warrant so long as they are

accompanied by police or fire officials who have determined that a 'hazard' exists" (Doc. 73

at 18) and Defendant Borough's failure to train its employees to handle recurring situations

presented an obvious potential for [a violation of federal rights]" (*id.* at 18-19).

## 1. Municipal Custom

Where there is no express policy on the pertinent issue and the plaintiff is therefore

attempting to prove that one official's misconduct was not an isolated occurrence,

allegations of a single act of constitutional violation does not show a custom or policy. *See*,

*e.g.*, *Doby v. DeCrescenzo*, 171 F.3d 858, 868 (3d Cir. 1999) (citing *Bielevicz v. Dubinon*,

915 F.2d 845, 851 (3d Cir. 1990)). As summarized in *Brown v. Pittsburgh*, 586 F.3d 263 (3d

Cir. 2009),

> the Supreme Court has explained [that], "[p]roof of a single incident of
> unconstitutional activity is not sufficient to impose liability under *Monell*, unless
> proof of the incident includes proof that it was caused by an existing[,
> constitutional] municipal policy, which policy can be attributed to a municipal
> policymaker." *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823–24, 105 S.Ct.
> 2427, 85 L.Ed.2d 791 (1985) (plurality opinion). The rationale for this rule is
> straightforward. "[A] single incident of police misbehavior by a single policeman
> is insufficient as sole support for an inference that a municipal policy or custom
> caused the incident." *Id.* at 832, 105 S.Ct. 2427 (Brennan, J., concurring); *see
> id.* at 822–24, 105 S.Ct. 2427 (plurality opinion) (contrasting the facially
> unconstitutional, explicit policy at issue in *Monell*, only one application of which
> was sufficient to trigger municipal liability, to fact patterns that present no such
> explicit policy, where "more proof than the single incident will be necessary" to
> establish a causal connection between the incident and some municipal policy);
> *see also Monell*, 436 U.S. at 691, 98 S.Ct. 2018 (explaining that municipal
> liability can exist even when "discriminatory practices" are "not authorized by
> written law," but only if such practices are sufficiently "permanent and well
> settled as to constitute a 'custom or usage' with the force of law" (quoting
> *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167–68, 90 S.Ct. 1598, 26 L.Ed.2d
> 142 (1970))).

*Brown*, 586 F.3d at 292–93.

Here Plaintiff is seeking to impose liability based on Defendant Panzarella's failure to get a warrant on February 6, 2016.  He provides no evidence of any similar incident. Therefore, Plaintiff must show that the failure to get a warrant on February 6th "was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker."  *Oklahoma City*, 471 U.S. at 824.  As set out above, Plaintiff identifies the custom at issue as "the custom of the officials of the Borough of West Hazleton to allow code inspections without any warrant so long as they are accompanied by police or fire officials who have determined that a 'hazard' exists."  (Doc. 73 at 18.)  He further states that "[t]his custom directly allowed Ms. Panzarella and Mr. Faust to conduct a warrantless search of Plaintiff's property directly causing a condemnation in violation of his constitutional rights."  (*Id.*)

Plaintiff's conclusory statements are not supported by citation to facts of record. (*See id.*)   Plaintiff does not identify a policymaker to whom the alleged policy is attributable as required pursuant to Supreme Court and Third Circuit precedent.  *Oklahoma City*, 471 U.S. at 823–24; *Brown*, 586 F.3d at 292.  Plaintiff states that the alleged custom "directly allowed" the Fourth Amendment violation but he presents no evidence of causation. Behavior that is not in violation of an alleged policy is not necessarily caused by the policy and it is proof of causation which is required to succeed on a single-incident claim.  *See id*. With these evidentiary deficiencies, an *arguendo* assumption of a Fourth Amendment

violation by Defendant Panzarella would not give rise to municipal liability based on a municipal custom theory of liability as a matter of law. Therefore, Defendant Borough would be entitled to summary judgment on this claim.

## 2. Failure to Train

"[A] municipality's failure to properly train its employees and officers can create an actionable violation . . . under § 1983." *Reitz v. County of Bucks*, 125 F.3d 139, 145 (3d Cir. 1997); *see also Estate of Roman*, 914 F.3d at 798 (citing Reitz, 125 F.3d at 145). The Supreme Court considered the contours of a municipality's liability under this theory in *City of Canton, Ohio v. Harris*, 489 U.S. 378 (1989). The Court held that "the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Id.* at 388. *City of Canton* explained that

> this rule is most consistent with our admonition in *Monell,* 436 U.S., at 694, 98 S.Ct., at 2037, and *Polk County v. Dodson,* 454 U.S. 312, 326, 102 S.Ct. 445, 454, 70 L.Ed.2d 509 (1981), that a municipality can be liable under § 1983 only where its policies are the "moving force [behind] the constitutional violation." Only where a municipality's failure to train its employees in a relevant respect evidences a "deliberate indifference" to the rights of its inhabitants can such a shortcoming be properly thought of as a city "policy or custom" that is actionable under § 1983. As Justice BRENNAN's opinion in *Pembaur v. Cincinnati,* 475 U.S. 469, 483–484, 106 S.Ct. 1292, 1300–1301, 89 L.Ed.2d 452 (1986) (plurality) put it: "[M]unicipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives" by city policymakers. See also *Oklahoma City v. Tuttle,* 471 U.S., at 823, 105 S.Ct., at 2436 (opinion of REHNQUIST, J.). Only where a failure to train reflects a "deliberate" or "conscious" choice by a municipality—a "policy" as defined by our prior cases—can a city be liable for

such a failure under § 1983.

> *Monell's* rule that a city is not liable under § 1983 unless a municipal policy causes a constitutional deprivation will not be satisfied by merely alleging that the existing training program for a class of employees, such as police officers, represents a policy for which the city is responsible. That much may be true. The issue in a case like this one, however, is whether that training program is adequate; and if it is not, the question becomes whether such inadequate training can justifiably be said to represent "city policy." It may seem contrary to common sense to assert that a municipality will actually have a policy of not taking reasonable steps to train its employees. But it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need. In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury.

*City of Canton*, 489 U.S. at 388–90.   As framed in *Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397 (1997), it is "municipal decisionmakers' conscious disregard for the consequences of their action—the 'deliberate indifference'— [which is] necessary to trigger municipal liability." *Id.* at 407 (citing *City of Canton*, 489 U.S. at 390 n.10).

The Court of Appeals for the Third Circuit has noted that, in some instances, ""the need for training can be said to be so obvious, that failure to do so could properly be characterized as deliberate indifference to constitutional rights even without a pattern of constitutional violations." *Thomas v. Cumberland Cty.*, 749 F.3d 217, 223 (3d Cir. 2014) (citing *City of Canton,* 489 U.S. at 390 n.10).  However, "[t]o find deliberate indifference from a single-incident violation, the risk of [the plaintiff's] injury must be a 'highly predictable consequence' of the . . . failure to provide [the allegedly necessary] training." *Id.* (quoting

*Connick v. Thompson*, 563 U.S. 51, 64 (2011)).  In this inquiry, the individual actor's

independent knowledge of the subject about which training is allegedly deficient is a factor

to be considered.  *Id*. (citing *Connick*, 563 U.S. at 63-67).

In support of his failure-to-train claim, Plaintiff points to the testimony of Defendant

Panzarella that she received no training from Defendant Borough related to the definition of

exigent or emergency circumstances, she received no training from Defendant Borough on

the proper authority she needed to conduct a warrantless search, and she received no

training from Defendant Borough on to whom she was to report as a building code official.

(Doc. 73 at 19.)  Plaintiff also cites Mr. Faust's testimony that all that is needed to conduct a

warrantless search is that there be a proclamation of a hazard by police or fire officials.  (*Id*.)

As a general observation, the Court notes that, when asked at her deposition

whether she had received training from the Borough on the matters set out above,

Defendant Panzarella responded that she did not receive the training about which

Defendant's counsel inquired.  (Panz. Dep. 119: 22-120:14 (Doc. 73-2 at 8-9).)  At one

point, she clarified that the question related to training from the Borough.  (Panz. Dep. 120:2

(Doc. 73-2 at 9).)  No evidence of record shows that Defendant Panzarella was asked

whether she received such training elsewhere or was otherwise knowledgeable about the

matters raised. Therefore, without more, Plaintiff cannot establish a causal link between the

Borough's lack of training on these issues and the events of February 6, 2021, based on the

testimony elicited.

Moreover, though Plaintiff avers that deliberate indifference is shown through this testimony, he presents no evidence regarding deliberate indifference of municipal decisionmakers.  He does not attempt to show that municipal decisionmakers had a "conscious disregard for the consequences of their actions or that the alleged failure to train reflects a "deliberate" or "conscious" choice by the municipality. *Bd. of Cty. Comm'rs of Bryan Cty.*, 520 U.S. at 407; *City of Canton*, 489 U.S. at 389.  Nor does Plaintiff present evidence to support liability based on "the need for more or different training [being] so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need," *City of Canton*, 489 U.S. at 390. [21]  The scant testimony cited is not evidence that the risk of a Fourth Amendment violation was a 'highly predictable consequence' of Defendant Borough's failure to provide training." *Id.* (quoting *Connick v. Thompson*, 563 U.S. 51, 64 (2011)).  As noted above, Plaintiff has not provided any evidence of other instances of improper warrantless inspections.  With these evidentiary deficiencies, an *arguendo* assumption of a Fourth Amendment violation by Defendant Panzarella would not give rise to municipal liability based on a failure to train as a matter of law.  Therefore, Defendant Borough would be entitled to summary judgment on this claim.

---

[21] Plaintiff overlooks the facts that Defendant Panzarella had been a building inspector for over two years as of February 2016, she had several years of experience in the field before that, and she completed numerous certifications and trainings in the field from 2000 through 2016. *See supra* p.3 & nn. 2-4.  These facts undermine Plaintiff's assertions regarding a link between the events of February 6, 2016, and Defendant Borough's alleged failure to train properly train Defendant Panzarella.

## V. CONCLUSION

For the foregoing reasons, the Motion for Summary Judgment of Defendants, Borough of West Hazleton and Diane Panzarella (Doc. 68) will be granted. A separate Order will filed with this Memorandum Opinion.

Robert D. Mariani
United States District Judge